Case No. 16-1303 et al. Island Architectural Woodwork, Inc. Petitioner v. National Labor Relations Board Mr. Mayer for Petitioner Island Architectural Woodwork, Inc. Mr. Leolis for Petitioner Verde Demontable Partition, Inc. And Ms. Johnston for the Respondent Mr. Mayer for Petitioner Island Architectural Woodwork, Inc. Good morning. Jeffrey Mayer, Nixon Peabody on behalf of Island Architectural Woodwork. The case we have today is a decision issued by, a decision order issued by the NLRB which overturned an AOJ's decision regarding an alter ego issue. The finding that the NLRB reached is not supported by the substantial evidence in the record. In fact, as this course is held in, recently held in Fred Mayer's stores, an August case coming from this court, the board totally ignores facts in the record and misconstrues findings of the AOJ. What do I mean by that? In order to find an alter ego, there are a number of factors that the trial level must find initially and then the board approve or confirm thereafter. Those include common ownership of the business, substantial financial control over the secondary business, common equipment, common premises, and common operational or common management of the employees. None of those factors were met at the trial level. The board misconstrues the AOJ's decision on a number of points. Those being, if you read the AOJ's decision, he says that the two businesses, Island and Verde, my co-counsel's client, were in the same sphere of business. What that means is Island is a millwork, a high-end, one-off architectural millwork company. They produce the paneling in this room, the desks in front of us, the veneers that are on the bench for it. Verde, on the other hand, produces the mountable partitions. Those are wood, glass, steel, brass, any other type of material, walls that are removable and can be moved around in office space. Two separate businesses. Judge Green at the trial level said they were in the same sphere of business. When you read the board's decision, they say it's the exact same business. The board also says that there's common equipment and common premises. That is also not true. When you read the AOJ's decision, Judge Green says that Verde is operating out of a facility that Island formally operated in and formally used the equipment of, which is now rented to or leased to Verde from Island. The board misconstrues these facts to reach the desired result that they wanted to reach. Aside from the work that the general counsel did at the trial level, they did the GC's work for them by reaching the decision that they reached, separate apart from the record evidence. Some of the other factors. Common ownership is one of the key elements of an alter ego finding. In this case, the record evidence shows there is zero common ownership. Verde is owned by a number of individuals, two of which happen to be the daughters of one of the owners of Island. There is no evidence in the record whatsoever that Mr. Refrano, one of the owners of Island, financed or otherwise provided his daughter with any funding for the acquisition of Verde, of the product Verde, which is the demountable partitions. I thought it was kind of interesting that the memorandum of understanding that was proposed, it had a provision in it that specifically contemplated the possibility that the owners of Island would become owners of Verde. Correct. And it specifically said that even if that happens, there still would be no alter ego relationship. Right. That was part of the negotiation with the union in the off chance that Island was to ever acquire Verde, which has not happened, which based upon the production that Verde is engaged in and the business Island is engaged in, is not going to happen. But it seemed like, I mean, maybe you would know better than us whether it could happen, but the memorandum that was proposed specifically contemplated that if it did, there wouldn't be an alter ego relationship, which kind of indicates that I think you wouldn't disagree with the proposition that alter ego can exist even without common ownership. That's correct. And so if the company that's trying to make something of the fact that there is no common ownership specifically proposes a provision under which common ownership actually wouldn't matter, then query whether the absence of common ownership actually matters all that much. I understand the point you made, Your Honor. The point, the response to that is that memorandum was part of a negotiation with the union. As with any negotiation, and none of this was brought up by the general counsel at trial. Memorandum was entered. It was not, that part was not questioned. It was not raised. General counsel failed to pursue that avenue, which you're now hitting on. But the board made something of that. But that's... The decision that we're reviewing, in other words, makes something of it. But the point is, as part of a negotiation, Island took the position that Verde is a separate entity. It's owned over here. It's a separate building. It's separate equipment. They make a separate product. We make something completely different. It's a different business plan. It's a different business model. It's mass production of a different entity, of a different material. It was put in there for negotiation purposes. And as with any negotiation with the union, the employer knew, Island knew, that there was going to be, there should have been a response from the union to counter that. It was put in there as a negotiation point. That's it. There was no alternative. There was no more intent to it than that as a negotiation point. Can I ask a record question, which is, there's another consideration, which is motive, motivation. And the board reached the conclusion that there was a bad motive here. As far as I can tell, the ALJ didn't come down on one side or another on the motive question. I believe Judge Green found that there was no motive on behalf of Island. Where is that? Because I didn't see that anywhere. His point was that because there was no change in the bargaining unit scope, that Island retained, or that the union retained all of its bargaining unit employees at Island, and that did not change, that there was no union animus or unlawful motivation on behalf of Island in selling the very license, the very name to a new entity. Maybe, I don't want you to have to fish through it now, but maybe on rebuttal, you could just point us to where in the opinion it actually says that. Okay, thanks. One of the problems with this case, as I see it, is that you make good points on individual factors, but it's a multi-factor test, and how are we to assess that here? Which factors, in other words, are in combination dispositive? I appreciate the question. I think on all the points, the totality of the circumstances here, the substantial evidence which the board is required to meet, none of the factors even look together altogether. Looking at all those, you can't reach the conclusion that an alter ego exists. So how did the board get it so wrong, then? You said to reach their desired end. Why would they have a desired end in a case like this,  I think their construction of the alter ego theory, doctrine, was conflated. They took the position that just because Mr. Refrano's daughters had an interest in the new company. I saw that in your briefs. You think it's a father-daughter thing. It's an implicit presumption that daughters who take over a business are necessarily controlled by their father. That seems to be what the board's implication was in reaching their decision. How do you get to that conclusion? The board didn't say that. There's nothing in the board's decision that said that. That's my point in this whole appeal, Your Honor. It's the exact same thing. The board reached these decisions without any evidence at the trial level. The record doesn't provide for any substantial finding that there's an alter ego. Wasn't the informality of the financial agreements between Island and Verde a significant part of the board's determination that this is not arm's length, and it's parent-child because one thing that shows that it's not arm's length is that only when they get challenged in terms of their compliance with the labor law do they try to pay for that. The uncontroverted testimony raised at trial, Your Honor, was that this agreement, this transaction was in place. It was in the works for a substantial amount of time. There are more than just Mr. Refrano's daughters as owners, as investors in Verde. You have a German architectural firm, one of the largest in the world, if not the largest in the world. You have two other investors who have industry knowledge in this particular field. The denounceable partition systems. And there's no overlap? Is that right? Zero. In terms of ownership? Yes. Zero. So what is the explanation for why Island and Verde failed to document the significant benefits that Island is giving to Verde? His testimony was, and the fact is, that these agreements were being negotiated. The lease was put in place earlier in the year, I believe in June or July, that they were working out the financial terms of the deal. And once it got to a point where other counsel, excluding McGinty and McGinty, which the board focuses on as the same attorney for both sides in their subpoenas, that the deal was consummated and finally put to paper. But the deal, the terms, the conditions, the sale price, the rental, the square foot rentals, everything was put in place. It just took a while, given the number of investors and the number of eyes that had to be on this thing, that it took that long to document. To the tune of several hundred thousand dollars benefiting Verde at Island's expense. Here's the thing with that. The board takes a position earlier in the case. They say that the type of work that Verde did compared to Island and the change from wood partitions to metal and glass was just an insubstantial deviation because of market factors. They put on their economist hat and they draw that conclusion that's nowhere in the underlying record. The hat they don't put on, which they just pass over, is a hat of a realtor. This was an empty space. It was being used sparingly, if at all, after Island had brought in an efficiency expert, after the downturn in the market. It was tens of thousands of square feet in an empty building that wasn't being used. A commercial real estate broker who had the board put on that hat would think it reasonable that if you have a few months' free rent, to bring in a tenant, which they did. They were paying rent at market values, $11 per square foot, and continued to pay those market rates. That's a concession that was made as part of the negotiation. It shows that there was an arms-length transaction. The board conveniently ignores that fact. They become economists and they want to become economists to shoot down Judge Green's trial-level decision, but yet they ignore the fact that market realities in the real estate world bear out that transaction and deem it reasonable. How do we assess, in the posture in which this case comes to us, and I'd be interested to know the board's thoughts on this, how do we assess the board's credibility determinations? It is interesting, and I think the board's probably better off speaking to their own credibility, but it is interesting that the board, in their decision in order, adopts or finds that Judge Green's credibility decisions at the trial level were sufficient, were met. There was no issue with that, given the standard drywall test that this board is very well aware of. However, given the fact of the limited witnesses that were subpoenaed by the GC, Judge Green adopts the testimony of Mr. Rufrano on behalf of Island. He adopts his testimony as credible in finding that there was no alter ego. The board, even though they say they adopt the credibility findings, they turn Mr. Rufrano's testimony on its head and effectively deem him non-credible, which flies in the face of standard drywall and what the board's role in issuing these decisions and orders is. Do any witnesses dispute the testimony of the union members that Rufrano actually wanted them to sign memorandum of agreement as a condition of further bargaining, and isn't that enough to show the intent? Again, Your Honor, I think that's part of the negotiation. The discussions between the union and Island at that point were that the union was questioning what was going on in the back building, in the Haynes building, where Verde was now operating as of October of 2013. It was Island's position, and still is Island's position, that that's a separate entity. And that it's fully lawful to say, to sign this? That they are separate entities and they are not part of the Island bargaining unit? I believe so, yes. I believe that is lawful. To exclude them, there are exclusions, there's definitions of a bargaining unit. For one party to agree with another party that they could have said the company down the street. They could have said Island Diversified, which is mentioned in the record. A separate entity completely across the street. Island Diversified, even though it shares the same name, or a similar name, is not part of the same bargaining unit and there is no right or access to those employees. Same concept there. The fact that it's a different entity, there's different ownership. Again, all of the alter ego factors were met in terms of disproving that an alter ego exists. That is 100% part of the negotiation process. Thank you. We'll give you some time on rebuttal. Thank you. May it please the Court, my name is Harris Leolas and I represent Verde Denountable Partitions. Your Honor, as Mr. Meyer discussed with you, none of the factors were met to prove that this is an alter ego. With respect to this business purpose, while Mr. Meyer explained to you, you know, your beautiful paneling here and the wooden desks here, that this is the work of Island, what Verde does is, imagine a raw space and you need to have four employees today. They built a denountable partition system for the offices. However, tomorrow you only have three employees and you need a conference room. Those partition systems open, make different rooms, different doors. This is completely different than a custom woodworking shop. Therefore, although Judge Green did indicate that it was the same sphere, that's like saying any interior construction is the same sphere, an electrician with a plumber. And the other big point is that Verde actually creates products that Island never did. The metal and glass partitions. Seventy percent of the business, which is unrefuted in the record, is the metal and glass partitions. They did the wood partitions, right? They did the wood partitions, Island. Island did wood partitions initially. And that was spun off. Correct. So now the business evolved into a metal and glass partition. The fact that Verde was able to evolve into this different type of business shows that it's a completely different business than Island. Island does woodwork. They don't do metal. Island could have never been able to take the advantage that Verde has to do the metal and glass partitions. And just to touch on also what Mr. Meyer stated, there is zero evidence that Mr. Rufano gave any money to any of his daughters to fund this business. His daughters are two partners in the business, along with one of the biggest architectural firms in the country, along with a prior partner in that architectural firm, Mr. Jeffrey Bright and Alan Shatton. These are separate and distinct owners who came together to form a separate business of a line that was basically dying at Island, because Island didn't have the capacity to do what Verde is now doing, one of them being the metal and glass partitions. And another important point is— You said that he didn't give his daughters any money, but he gave them assets and equipment, real estate of great value. For a price. That's not disputed. Well, no, for a period of time, not for a price. You know, let's take the lease first. At that time, I think it was 2014, the market was a lot lower than it is now. Many landlords are giving incentives to their tenants to come in, whether they pay for the build-out, give them a four-month build-out period. This is the same thing as any other landlord-tenant relationship. They basically had, I think, a six-month period where they weren't paying rent from October to June when that lease was solidified. And in connection with the notes, that's the same thing. I mean, I would end this on the record and speculate. Many businesses are sold based on notes. Not everybody pays the full purchase price at the transaction. The fact that the notes are spread over 36 months also is not indicative of anything. At the end of the day, they're also paying interest on those notes, and with respect to the equipment lease, it's the same thing. At the end of the day, I think for the equipment lease, if I did the math, they're paying $750,000. So essentially, this is really a business sale of $1.5. But none of that is documented. There's no effort to use this as a sweetener to get other potential tenants who might pay more. There's no evaluation of the value of this and taking it as a loss on the part of Island. We just don't have any information that one would expect in the kinds of transactions you're talking about where someone says, hey, we're going to give you up front some freebies to tempt you in. It just doesn't look like that. Well, I think the other big consideration here also was Mr. Rufano's relationship with the big architectural firm. He couldn't sell it to anybody. He tried to sell it to two or three different distributors. I think one of them was no, one of them was steel case. And the architectural firm didn't work with them and therefore would not have agreed to that. I mean, that's another big distinction here is that Mr. Rufano had to keep his relationship with the architectural firm. Rather than him letting this line, this green line die and possibly his rest of his business with the architectural firm, he had to find a suitable person to do that. Jeffrey Bright had worked with his lawyer. Therefore, over the four years that this entire transaction really evolved over a four-year period, it's not like all of a sudden one day they decided, hey, we're going to sell this to these individuals. It kept evolving to the point where Jeffrey Bright felt comfortable working with, and this is all on the record, Jeffrey Bright felt comfortable working with Tracy Pagotta. This was Jeffrey Bright's idea to work with Tracy. How does the fact that it was attempted to be sold to another entity play into the sham or alter ego analysis? Well, it shows that it was an on-the-flank transaction because he did try to sell it somewhere else. It's not like he just went right to his daughters and then said, you know what, tomorrow we're closing up shop and this is it. I mean, the testimony in the record, all of it as a whole, there's no basis to find that this is an alter ego. And in addition, the Island's own shop steward, Mr. Hortzman, testified that Verde employees never direct the employees of Island. If there is some product that has to be part of that agreement, if there is some product that Island is working on at the time, they determine how to do that and how to create that product. It's just like any other vendor-vendee relationship. There's no difference here. Thank you very much. May it please the Court, Rebecca Johnston from the National Labor Relations Board. The counsel for Island and Verde paint an entirely different picture that is not borne out by the record evidence. In fact, substantial evidence supports the Board's finding that the two entities are in fact alter egos and violated the act when they did not recognize and bargain with the union as the representative of Verde employees who are performing bargaining unit work in the back building. So common ownership, you agree that there's no overlap in ownership, correct? Yes, the Board found there was no common ownership. However, in the absence of common ownership, the Board looks to other factors. So on the other factors, there's no overlap in management, correct? There's also no overlap in labor management. However, here, going back to the common ownership, in the absence of common ownership, the Board has found alter egos where there is substantial financial control. Here, as you were discussing with opposing counsel, there was a lack of an arm's length relationship. Is that simply because they're daughters? No, the Board did not rely on the fact that this was a family relationship. And counsel goes into great detail citing a number of family cases of the Board, and those cases simply show that the Board is cognizant that family members can go into business with each other and not be alter egos. But here the problem is that the relationship was not at arm's length. Bertie was permitted to operate in Island's premises, on Island's equipment, with some of Island's former employees. Were they paying for them, the premises? They were not paying for a full eight months. Only after that. After that, did they pay for the premises? There's no evidence in the record that they were making payments, but there is a lease, and that lease was signed in June. And they make different products. The Board found that they have a substantially similar business purpose. Opposing counsel is looking at the wrong point in time. For most alter ego cases, or many alter ego cases, one business shuts down entirely, and another business starts back up doing the same thing. Right. The whole thing's a big sham is the term that you see in a lot of the cases, I think, is sham. And we don't have a shutdown of the original business in this case. Right. Here it's just a portion of the business. And you'll see that in the Third Circuit case in Stardine, where they just shut down a portion of the business, and that portion became non-union. A similar thing happened here. Island was attempting to make these Verde demountable partitions. They found that it wasn't possible and shut down that portion of the business and transferred it over to this purportedly new entity to pick up. But on that transfer to the purportedly new entity, that was not the first move they made. They tried to, correct me if I'm wrong, tried to interest other arm's-length businesses in taking over that portion of the business, I think to placate the client, correct? Yes. The record says that they did try to sell the business to a number of entities. And that shows a – it's not dispositive, clearly, but it does show that there's not some immediate sham motivation here in the way that where you have the shutdown and restart with a new name or something like that. Possibly. However, they were in talks during this time with this Jeffrey Bright. Rufrano was in talks with Jeffrey Bright at this time. They were shopping it on the open market. And then also, as my understanding of the record, they were also having these other discussions, including formation of this new purported entity, Verde, with Rufrano's daughter. What are we to make of the ALJ's decision? I've said this for about 11 years now, but whenever I see an agency disagree with an ALJ, it's at least a yellow flag if it's not on the wall, purely, if there's some factual component to it. And the ALJ here, of course, I'm not sure how you characterize this. It's kind of a mixed question of, well, in fact, the ALJ, as you know, reached the opposite decision. What are we to make of that? That's right. This Court has said that the standard of review does not change. It's still a substantial evidence test. The Board is the agency that Congress has entrusted to administer the labor laws and is able to substitute its findings for that of the Administrative Law Judge as long as they explain, which they did here, and as long as their decision is supported by substantial record evidence, which it is here. Regarding the credibility findings, there simply aren't a lot of credibility findings by the Administrative Law Judge. I think there's one where it depredits the two union employees that Refranos refused to meet. Your point, and this is a helpful question for you, is that this is, in essence, a mix of factors, and the ultimate determination is more in the nature of a legal determination than a factual determination. I think that's right. It's mixed and not heavily reliant on credibility determination. As I read the ALJ's decision, the ALJ went through a lot of cases in the part of the analysis that did the legal work and documented the considerations that were set forth in all the cases, and then there's a concluding paragraph at Appendix 15 that says, After considering the facts in the present case in light of the multifactor test set forth in the cases described above, it's my conclusion that the balance of evidence shows that Verde is not the alter ego. I don't know that there's a whole lot more to the analysis than that statement of conclusion informed by the way the cases that the ALJ went through sifted through circumstances that were applicable in those cases. That's right. The ALJ did make some findings before it goes through the cases. It found that they shared a business purpose. They shared interrelated operations, equipment, premises. Where the ALJ differed from the board was ownership or substantial financial control. I do believe he sort of made a finding on motive with respect to harm to the bargaining unit. He didn't address the memorandum. He didn't address these comments that Ruffrano made that Verde could produce the product more cheaply because it was non-union, and he didn't address additional evidence of motive. Where there's no common ownership or even overlap in ownership, no overlap in management, and they make different products now, at least. What's your best case? I'm not sure I could get back to you on that. I'm not sure I have a case exactly on point. I wouldn't submit that they are making different products here, though. I can see that there is separate ownership, and I can see that there is separate management of labor relations. But they do make the same product. Right, the spinoff of the product. Maybe I'm just burdened by alter ego doctrine in other lines of the law, or maybe burdened by common sense, but this doesn't seem like alter ego in the usual way you think of an alter ego, when there's no overlap in ownership or management, and they're now making different things, and there is rent being paid, and I take the point that there was a gap there. That's not usually, you don't usually look at that situation and say, oh, that's alter ego, unless you throw in the family aspect, and I think that's the point that the blue brief was making, is that the cloud of the family relationship always raises a suspicion that the family is operating as a unit that's trumping the business formalities, and I think that's not stated in the board's opinion, but the blue brief seems to suggest it's implicit in how the board reached its result here, given that there's no common ownership, no common management, and they make different things. Certainly the family dynamic sort of colors the relationship and perhaps explains that it was the lack of an arm's length dealing, but also in discussing it. Can a father and daughter have an arm's length transaction? Certainly, but here that's not what happens. They have this sort of interrelated operations. There's some families that don't get along at all. I think it would be more than an arm's length transaction, depending on the circumstances you'd ever... Can a friendly father and daughter have an arm's length transaction? Certainly, and many of the board cases that opposing counsel has found, has found arm's length transactions between family members. The board isn't trying to limit family members from going into business. The board's concern here is the substantial financial control, as evidenced by the lack of arm's length dealing, and also there's strong evidence of motive. Ruffrano testified that he was concerned about the plight of unionization and his inability to compete on the market in producing... Well, that's every small business owner in the country would say something like that. What is the different product? I thought it was sort of an evolving situation, where first Verde was making something that Island had been making, the wood versions, and that they sort of, after they were established, they quickly switched toward more of the metal and the glass, but that at the time it was a kind of, here's something we're doing, we're going to roll it off into a new unit. That's right. At the time of the so-called transfer to the business, they just simply took off where Island left off in attempting to manufacture these green partitions. So you don't concede that this is a different product for purposes of this analysis? Not the green partitions, no, but they did... The other partitions are a different product. They were never manufactured by Island, right? That's right. Due to lack of market demand, they began manufacturing these metal partitions, and at the time of the hearing, which was approximately, it was over a year later, they were making 70% metal. The anti-union motive, to me, doesn't jump out at me, and here's why, and you tell me why I'm wrong. What jumps out at me is they wanted to placate this client and keep the client's business. They wanted to do that. They needed to have a partition. They thought they would help, correct me if I'm wrong, to have a partition business, but it wasn't profitable for them to do it. So they tried to find other businesses to do the partition business that then the client, the firm, could deal with. That didn't work. Again, the motive is the firm, keeping the business with the firm, and finally they spin it off into this with people they know, but not common ownership, not common management, and paying rent and the like and using the same equipment. The motive of anti-unionization that we see definitely in a lot of cases, much more directly, seems pretty deep in the background here. The motives here seem to be let's placate the firm, let's find another business that can do the partitions, let's figure out a way to keep this going. Why is that wrong? That's the opposing counsel's version of the facts. I know. Why is that wrong? Supported by the record, sure. We're not looking for the kind of animus that would make a separate 8A1 violation. We're looking for an intent to avoid their obligations to the union under the collective bargaining agreement. So you have several examples of motive. Refrano repeatedly communicated his intent that the Verde employees not be unionized. Assuming these are two separate entities, why is he wanting these employees of another entity not to be unionized? He, again, said that he had the plight of a union contractor, suggesting that he couldn't make these partitions competitively because of his status as a union contractor. Was that false? He appeared to have been losing money in trying to make these partitions. But he also then told the union— That seems like a funny way—I mean, the board says he communicated his intention that the Verde employees not be unionized, and he's saying, you know, you union from here, you won't go over there, no union employee can step foot in there. I mean, it's the business case. I don't know. Is the business case actually anti-union, if it's factually true? I'm sorry. I don't understand. Well, I mean, to the extent that someone said, I can't make money doing this and paying union wages, do you construe that to be an impermissible anti-union motive? If he creates an alter ego to continue the business— But that's sort of circular, because what we're trying to find out is did he create an alter ego? And one of the factors is what was the reason for doing it. If there was a business reason for doing it, that would seem to me to cut the other way and say that it's permissible. Whereas if he says, I'm going to create this other unit and I'm going to draw a bright line between that unit and this unit because I want to confine union membership, that seems different from saying whatever I'm doing in this place is losing money, including the wage levels I'm paying under the agreement. I'm going to set up something that's more efficient in the back building. That would seem to me not to be anti-union, but you equate the two. Right. In the board's view, that is evidence of motive. And even if there were more than one motive for creating this other entity, there still is, according to the board's view of the evidence, strong evidence of anti-union motive. Can you just continue with the list? Yes. The first one was that Raffano was saying that he wants Verde to be anti-union and why would he be doing that if he has no control over Verde. I got that one. What's the rest of your list? And in keeping with that, his continued pressure is that the union disavow bargaining unit work over there. And in this memorandum of agreement, he makes promises to the union that he will have exclusive business deals with Verde because they are able to produce it more cheaply as a non-union entity and an island would stand to gain millions of dollars from this sort of setup. If Verde stays non-union. That's right. And another evidence of motive is the timing of signing these formal documents. Again, this wasn't an arm's length transaction. They operated for eight months to a year without these formal documents. They only signed these agreements the day before producing them pursuant to the general counsel's subpoena. That goes to the alter ego question. I'm not sure that goes to an anti-union motive. It goes to sort of the concealment from the union of what exactly was happening and hiding what was going on. And that was my final point was that they never told the union what was going on. They simply told the bargaining unit members who were working in the back building to leave. They said no union members were allowed to ever enter this building again. They didn't say no island employees. They said no union members. They slapped up a Verde sign and then told a continually evolving story to the union about what was happening in the back building. First, Raffano said he wouldn't set foot back there, that it was an entirely separate entity. And then he later conceded that he would be involved, though he couldn't give them details. And this goes. . . Do you think if he had the opinion, which he expressed, had the opinion that a company engaged in this partition business would not be able to compete with other suppliers or other competitors if they had a unionized workforce, is that evidence of anti-union animus to state that? Not necessarily anti-union animus, but certainly an intent to evade his collective bargaining obligations. This is a more legal question now. The relationship between successorship doctrine and alter ego doctrine. . . Can you give me the . . . Because I think that affects the back pay obligation here. If this were a successor, there might not be a back pay obligation. Under the alter ego finding, there is a back pay obligation. What is the distinction between those two things as you see it? Right. A successor, there's no significant change in the essential nature of the business, and also a majority of the new employees were employed by the predecessor. And that's the part that's missing here? Arguably. This was never a part of the general counsel's case, but it would affect the remedy. And why go with alter ego rather than successor if you're the general counsel? The remedy is different. You're trying to get the back pay. I can't speak to why they chose to plead the case this way, but the remedy is different for a successor. That was a big part of it, right? That's right. How much money is involved? I don't have the answer. For the back pay? Mm-hmm. I don't have the answer. I think I heard you. I have a conceptual question. If you have a circumstance in which a business is covered by a collective bargaining agreement that says, you know, it would be much more profitable if I could have this one division be non-union, but the CBA doesn't allow me to do that. And so what I'd like to do is just siphon that part of the business off into a separate entity. I'm doing it for the reason that I can't make profits off it as it stands. So this is my whole objective is to not be subject to the collective bargaining agreement with respect to these particular employees because this is costing me an arm and a leg. But then everything that the entity does in creating that is entirely above board so that it's a bona fide transaction, it's arm's length, it's a separate entity, it's got separate ownership, it's got separate management. There's no reason to think that there's anything nefarious about the operations of the entity that's cordoned off. Would that be a problem? Under those, I can't totally bind the board, but under those facts, that would seem to suggest that it's not an alter ego. Those facts are remarkably different here, though. Yeah, no, I'm not suggesting that. I'm just trying to figure out as a legal matter what role motive plays in the analysis. Motive is not necessary, but it certainly colors it. I thought it is, and this is the oddity that I was trying to get at in my earlier question. Judge Srinivasan's question isolates this, which is normally when you think about alter ego, I guess I don't think about motive. You think about the construct of the business. But motive is definitely part of the board's analysis of alter ego in the labor law context. And I understand why. And the question, I think Judge Srinivasan's question helpfully isolates for me, is how much of a factor is it? If you have nothing else, can it be enough when you just create a separate business or a separate business is created if the motive was to get out from under the union obligations? I don't think motive alone would create enough. Right, and then the question is how much. Yeah, I'm not necessarily sure it would be wrong to say that motive alone would be enough as a matter. I mean, I don't know that we know whether that would be an invalid interpretation of the statute. I was just curious as to the way that the board currently interprets things under its decisions, whether it views motive to be an independent driver or whether it's more of an additional consideration that informs a conclusion that at least has to be borne out in some other respects in favor of an alter ego determination. And it sounds like it's that. It's the latter. If you just had the motive but it was a totally separate business, isn't that where the successorship doctrine can kick in? Or am I wrong about that, if the employees are all the same? Possibly, yes. Right, and the difference between the successorship and the alter ego would be the remedy, right? And that's why they probably went for alter ego here, but you don't need to concede that. Are there any further questions? No, thank you very much. And we'll give you a time on rebuttal. Judge, just to hit on a couple of points in the underlying trial decision. Appendix A-12 and A-14, bottom right column, last paragraph on A-12, Judge Green starts his analysis of union motive or lack of union motive in this case, and that carries over, or it doesn't carry over. There's a new paragraph at the top of, or continued on to the top of A-14, where he also addresses the lack of union motivation in the transaction. Yeah, so that goes to, right, motive insofar as it's informed by adverse effect on employees. That was the understatement. Thank you. And just to touch base on the last point we've been talking about, about union motivation or the lack thereof, we still have to be mindful that the work at all, well, two things. One, Island's original negotiation with the union in saying that we are not one and the same with Verde, Verde is not part of our bargaining unit, stems from the simple presumption that Island, as it is, or Verde is, a separate entity. You cannot, as Island, bargain on behalf of another company's employees. That's the simple motivation behind the MOA when you boil it down. They're not our employees. We can't bargain on their behalf. That's up to Verde to do whatever Verde wants to do. They're not Island employees. We cannot lawfully or legitimately bargain on their behalf. It's a whole new group of employees back there. It's a different unit. They're not ours. That's as simple as that can be boiled down from Island's perspective. Also, in terms of any benefit, a financial benefit, that Refrano or Island could theoretically reap from Verde being union or non-union, it doesn't matter to them, or did not matter to them at that time, regardless of whatever Verde was paying in terms of wages or benefits. Because what Island was getting out of it was cost plus 20% of the veneer work they were doing. It didn't matter what Verde was paying out of pocket. They had a profit margin built in place for work they were doing. It didn't matter. Didn't they care about the ongoing success of Verde because that would help with the firm, and they had a relationship with the firm, and they were trying to make sure the firm was covered on this other... Sure, but that's as a mass-produced, demountable partition business, which is what Verde was evolving into. Whether it was union or non-union was not a motivation. Island's motivation was, look, they're going to mass-produce it. We're not handling it. It's a new entity, and if it hasn't worked for us, we're going to do it across the state. Didn't they think they were more... Maybe I'm misunderstanding, but I think the board's counsel suggests, or maybe I was putting words in her mouth, but that there was an expression that Verde would not be as successful or couldn't make a go of it if it had unionized workforce. I don't know where that exists in the record, Your Honor. I do not recall that. I don't believe that was part of the underlying record or trial transcript. Well, I think it's J.A. It's a couple places in the board opinion. It talks about the plight of union contractors and the union would benefit from Island's increased profits if Verde remained non-unionized, and then Island could get business through Verde or have contracts in which it would collaborate with Verde. Your Honor, what state was that? Well, the J.A. 248, J.A. 444, just a few places where Rufrano is talking about where everything's going to be better if they're non-unionized. The simple answer to that question is still, from an Island's perspective, their profit margin was based upon the work they did for Verde and not because of Verde's union or non-union status. It didn't matter. Okay. Thank you. Thank you. Do you want any time on rebuttal or are you good? You're good. Okay. Thank you to all counsel. The case is submitted.
judges: Kavanaugh, Srinivasan, Pillard